<div style="text-align:center; transform: rotate(-90deg)">United States District Court<br>Northern District of California</div>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | Case No. 25-cv-02079-LJC |
| Plaintiff, | **ORDER GRANTING MOTION TO COMPEL ARBITRATION** |
| v. | Re: Dkt. No. 11 |
| THE WEITZ COMPANY, LLC, | |
| Defendant. | |

Plaintiff Great American Insurance Company (Great American), a surety company, sued The Weitz Company, LLC (Weitz), a general contractor, for breach of contract and declaratory judgment relating to a dispute over a performance bond issued by Great American. Weitz contends that these claims must be arbitrated and has moved to compel arbitration. ECF No. 11. For the following reasons, Weitz's motion to compel arbitration is granted.[1]

## I.    BACKGROUND

Weitz, part of a global construction conglomerate, is the general contractor for a construction project (the Enso Project) in Healdsburg, California. ECF No. 1 (Compl.) ¶ 10; ECF No. 20 at 16-17; *see* ECF No. 13. It solicited bids for subcontractors to complete HVAC work on the Enso Project. ECF No. 20-2 ¶ 5. California Environmental Systems, Inc. (CES) submitted a

---

[1] Great American's request for judicial notice at ECF No. 20-4 is also granted. Great American requests that the Court take notice of four exhibits consisting of filings from other litigation Weitz was a party to, from the Southern District of Ohio, the District of Arizona, and Sonoma County Superior Court. *Id.* at 2. Federal Rule of Evidence 201 permits courts to take judicial notice of facts "not subject to reasonable dispute[,]" such as matters of public record. This "may include court records[.]" *United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018). Although a court may take judicial notice of the existence of such documents, it cannot take judicial notice of "disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F. 3d 988, 999 (9th Cir. 2018). As Great American's four exhibits consist of court filings, it is appropriate for the Court to take judicial notice of them. *See* Fed. R. Evid. 201.

bid, which Weitz selected. *Id.* ¶¶ 6, 8. CES is certified by the State of California as a small business entity and, in 2021, had an average annual revenue of between $15 and $20 million. *Id.* ¶¶ 2-3. After Weitz accepted CES's bid for HVAC work on the Enso Project, Weitz sent CES a form subcontract agreement and related documents, totaling 133 pages. *Id.* ¶ 8. CES requested that certain terms regarding the scope of CES's work be modified, which Weitz accepted. *Id.* ¶ 12. Weitz "refused to make" other requested revisions. *Id.* ¶¶ 12-20. CES and Weitz executed the final subcontract (the Subcontract) for CES to complete HVAC work on the Enso Project in June 2021. Compl. ¶ 10.

### A.     The Subcontract

The Subcontract governs CES and Weitz's obligations to each other with respect to CES's work on the Enso Project.[2] The Subcontract provides that the total sum payable to CES for proper completion of CES's work on the Enso Project is $7,358,386.52 (the Subcontract Sum), and, at Exhibit A, details the scope of CES's work. Compl. at 16-17, 18-74. There is no Exhibit B. Exhibit C to the Subcontract lists "Special Terms and Conditions" that CES and Weitz must comply with, such as CES using "battery-operated tools wherever and whenever possible" and Weitz providing hardhats and safety vests to CES's employees. *Id.* at 76-81. Exhibit D lists "Standard Terms and Conditions," including requirements for workplace safety, procedures for modifying the scope of CES's work, CES's termination rights, and dispute resolution procedures. *Id.* at 82-128. There is no Exhibit E or F to the Subcontract. Exhibit G lists CES's insurance requirements. *Id.* at 129-41.

The instant dispute turns primarily on terms in Exhibit D. Section 2.2 of Exhibit D requires CES to obtain a performance bond from a surety guaranteeing that, in the event CES does not fulfill its contractual obligations for its work on the Enso Project, the surety will complete or pay for CES's default. *Id.* at 89. The penal sum (that is, the maximum amount the surety would pay) is equal to the Subcontract Sum. *Id.* Section 2.2 provides that the penal sum of the performance bond "shall be automatically adjusted by any modifications" to the Subcontract Sum

---

[2] The Subcontract is attached as Exhibit A to Great American's Complaint. Compl. at 15-141.

and that the "surety waives all requirements for notice of modifications" of the Subcontract Sum and penal sum. *Id.* It further provides that "reference to [the Subcontract] within the Subcontractor's performance bond, if any, shall be deemed as an express acknowledgment and consent by surety to be bound by all duties, liabilities and obligations which Subcontractor has to Contractor in the event of delays or time related damages suffered by Contractor as a result of Subcontractor's performance or failure to perform." *Id.*

Section 9 of Exhibit D sets out "Claims and Dispute Resolution" procedures. *Id.* at 100. In relevant part, section 9.1 provides:

> The Subcontractor [CES] agrees to be conclusively bound by the Contractor's [Weitz's] decisions on all matters, unless the Subcontractor disputes such decision in writing within seven (7) calendar days following receipt of the Contractor's decision. In the event of any dispute, controversy or Claim ("<u>Claim</u>") between the Contractor and Subcontractor arising out of or related to the Subcontract Documents or the breach thereof, each party shall promptly notify the other upon discovery of any Claim, and shall in good faith meet to resolve the Claim by mutual agreement…

*Id.* Section 9.2 (the Arbitration Provision) specifies that:

> Any Claim not resolved under item 9.1 shall, at the option of the Contractor, be determined by arbitration in accordance with the Federal Arbitration Act. The arbitrator shall address all then pending and unresolved Claims…The Contractor and Subcontractor shall mutually select an independent arbitrator within five (5) working days following notice of intent to arbitrated delivered by Contractor to Subcontractor…The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof…

*Id.* Section 9.3 provides that if Weitz elects not to arbitrate a claim, then "all requirements and conditions…pertaining to arbitration shall be deemed appropriated adjusted to permit (i) Contractor to pursue such Claims at any times as otherwise permitted or required by the Subcontract Documents or by law or equity" and to permit CES "to pursue all Claims through a single litigation at any time after substantial completion of the Project[.]" *Id.* Section 9.6 provides that section 9 shall not be deemed a limitation of rights or remedies which the parties may have under state mechanics' lien laws, public contract claims laws or under applicable performance bonds or payment bonds. *Id.* at 101.

Section 1.8 of Exhibit D addresses the relationship between the Subcontract, its exhibits,

and related documents.  It provides that the agreement between CES and Weitz consists of the two-page Subcontract, the exhibits to the Subcontract, any modifications to the Subcontract, CES's payment and performance bonds, and the prime contract (the contract between Weitz and the property owner), collectively referred to as the "Subcontract Documents."  *Id.* at 88.  It provides that, in the event of any conflicts between the Subcontract Documents, the provisions govern in the following order of priority: 1) modifications to the Subcontract, 2) Exhibit F to the Subcontract, if any, 3) Exhibit A to the Subcontract, 4) the Subcontract, 5) Exhibit C to the Subcontract, 6) Exhibit G to the Subcontract, if any, 7) Exhibit D to the Subcontract, 8) Exhibit B to the Subcontract, 9) any other exhibits to the Subcontract in letter order, 9) the performance and payment bonds, and 10) the prime contract.  *Id.*  As relevant here, in the event of a conflict between the two, Exhibit D to the Subcontract takes precedence over the performance bond.  Section 1.8 explains that the entirety of the Subcontract Documents "together form the contract between" CES and Weitz.  *Id.*

Lastly, Section 3.6 of the Subcontract provides that Weitz "shall be allowed to deduct from any payments otherwise to be made to Subcontractor [CES]…any amounts to the extent necessary to protect the Owner or Contractor [Weitz] from loss because of…any amount due Contractor from Subcontractor under any other agreements between the parties[.]"  *Id.* at 92.  That is, if CES owes Weitz money pursuant to another agreement, Weitz may deduct that amount from what it would otherwise owe CES.

### B.    The Performance Bond

CES obtained performance and payment bonds for its work on the Enso Project from Great American.  Compl. ¶ 11, Ex. B.[3]  Weitz provided its form performance bond to CES, who sent the form performance bond to a bond agent working with Great American.  ECF No. 20-1 ¶¶ 1, 4.  Based on the language of Weitz's performance bond, the bond agent believed that the performance bond "could not be modified or it would not be accepted by Weitz."  *Id.* ¶ 9.  The bond agent did not attempt to negotiate the terms of the performance bond and completed it without

---

[3] The performance bond is attached as Exhibit B to Great American's Complaint.  Compl. at 148-49.

modifications. *Id.* ¶ 11.

The performance bond lists CES as the principal and Weitz as the obligee. Great American is the surety. As required by the Subcontract, the penal sum of the performance bond—the maximum amount Great American would be obligated to pay Weitz in the event of CES's default—is equal to the Subcontract Sum of $7,358,386.52, although the performance bond specifies that Great American "waives any requirement to be notified of any alteration or extension of time or subcontract price made by the Contractor in the Subcontract." Compl. at 148. The performance bond provides that, if CES defaults on the Subcontract, Weitz may make a written demand on the performance bond and "shall make the Subcontract Balance (the total amount payable by the Contractor to the Subcontractor pursuant to the Subcontract less amounts properly paid by the Contractor to the Subcontractor) available to the Surety [Great American] for completion" of CES's work on the Enso Project. *Id.* After Great American receives a written notice from Weitz that CES is in default, Great American has thirty days to:

> [R]emedy the default or….notify the Contractor in writing of its election to….
> a. Complete the Subcontract Work…;
> b. Arrange for the Completion of the Subcontract Work…;
> c. Waive its rights to complete the Subcontract Work and reimburse the Contractor the amount of its actual costs, not to exceed the Bond Sum, to complete the Subcontract Work less the Subcontract Balance…

*Id.* The performance bond includes a dispute resolution provision, which states:

> Any dispute pursuant to this Bond shall be instituted in any court of competent jurisdiction in the location in which the Project is located and shall be commenced within two years after default of the Subcontractor or Substantial Completion of the Subcontract Work…

*Id.* at 149.

The performance bond states, "The Subcontract is incorporated by reference into this Bond," and further provides:

> Subcontractor and Surety expressly acknowledge that any and all provisions contained in the Subcontract or implied by law including without limitation those relating to . . . damages, and warranty, are expressly covered by, incorporated in, and made a part of this bond, and lie within their obligations and are included within the coverage and scope of this bond.

United States District Court
Northern District of California

5

*Id.* at 148-49.

### C.    CES's Default and Ensuing Disputes

By November 2023, CES had defaulted on its obligations under the Subcontract. *Id.* ¶ 14. Weitz informed Great American of CES's default and asserted a claim against the performance bond, demanding that Great American fulfill its obligations pursuant to the bond and complete or pay for CES's outstanding work on the Enso Project. *Id.* ¶¶ 14-15. During the thirty-day period following Weitz's demand on the bond, Great American requested documentation regarding the Enso Project and requested access to the project site. *Id.* ¶ 17. Great American calculated the Subcontract Balance—"the total amount payable by" Weitz to CES pursuant to the Subcontract, "less amounts properly paid by" Weitz—as $1,234,556.65. *Id.* ¶ 19, at 148. Per the performance bond, in the event of CES's default, Weitz was required to make the Subcontract Balance available to Great American for completion of CES's work. *Id.* Weitz disagreed with Great American's calculation of the Subcontract Balance, contending that the Subcontract Balance was $0.00 as CES had defaulted under the Subcontract. *Id.* ¶ 21. Weitz proceeded to hire other subcontractors and suppliers to complete CES's outstanding work and sent Great American two invoices for these costs. *Id.* ¶ 22.

In an apparent effort to avoid litigation, in March 2024, Weitz and Great American entered into an interim agreement (the Enso Agreement). *Id.* ¶ 23. The Enso Agreement required Weitz to provide invoices for CES's outstanding work it completed on an ongoing basis, to allow Great American access to Weitz's databases to verify the invoices, and to allow Great American access to the Enso Project and meetings with subcontractors. *Id.* at 156-57. It required Great American to make a $1,000,000 good faith payment to Weitz and pay Weitz additional costs for a lawsuit related to CES's default, to be deducted from Weitz's claims against the performance bond. *Id.* at 156. The Enso Agreement memorialized that when the performance bond was issued, the penal sum was set at $7,358,386.52. *Id.* at 155.

Weitz contends that the penal sum of the performance bond is $8,078,092.93. *Id.* ¶ 33.

### D.    The Mill Project

Separate from CES's Subcontract to work on the Enso Agreement, CES and Weitz entered

United States District Court
Northern District of California

into a subcontract for CES to complete work on another construction project, the Mill District Project. *Id.* ¶ 34. As with its work on the Enso Project, CES obtained a performance bond from Great American for its work on the Mill District Project. *Id.* ¶ 35. CES defaulted on the Mill District Project as well and Weitz made a claim against the Mill District Project performance bond, demanding that Great American pay it $3,589,389 for CES's breach. *Id.* ¶ 58.

The Enso Subcontract contains a provision that Weitz may deduct "any amount" CES owed Weitz "under any other agreements between the parties" from the amount Weitz would otherwise have to pay CES. *Id.* at 92. Great American alleges that Weitz contends "it can make an affirmative claim under the Enso Performance Bond" for the full $3,589,389. *Id.* ¶ 58. Great American contends that the performance bond does not allow Weitz to make an affirmative claim against it, and instead only allows Weitz to deduct what Weitz is owed relating to the Mill District Project up to but not greater than the amount Weitz owes CES pursuant to the Enso Subcontract. Accepting Great American's allegation that the Subcontract Balance for CES's work on the Enso Project is $1,234,556.65 for the purpose of illustrating the parties' arguments only,[4] under Weitz's interpretation, as what CES owes Weitz for the Mill District Project is greater than the Subcontract Balance, Weitz could deduct the $1,234,556.65 it owes CES from the $3,589,389 and then demand payment of the remainder, $2,354,832.35, to make itself whole. Under Great American's interpretation, Weitz could only deduct the $1,234,556.65 Subcontract Balance under the Enso Subcontract and could not recover the additional $2,354,832.35.

### E.    The Current Litigation

Great American sued Weitz for breach of contract, alleging that Weitz breached the performance bond by refusing to pay Great American the Subcontract Balance of $1,234,556.65. *See* Compl. at 13 (Prayer for Relief). Great American demands compensatory damages in the amount of $1,234,556.65. *Id.* Great American also seeks declaratory judgments that the maximum amount Great American owes Weitz under the performance bond is $7,358,386.52, less any payments Great American made to Weitz under the Enso Agreement, and that Weitz cannot

---

[4] The Court is in no way making a determination that the Subcontract Balance is $1,234,556.65 or that Weitz owes Great American this amount.

make an affirmative claim against the Enso Performance Bond for money Weitz claims CES owes

it pursuant to other agreements between the parties.  *Id.* at 13-14.

Weitz filed the instant Motion to Compel Arbitration, alleging that Great American is

bound by the Subcontract's arbitration provision and must arbitrate its claims against Weitz.  ECF

No. 11 at 2.  CES is not a party to this litigation and neither Weitz nor Great American contend

that CES is in arbitration regarding its default on the Enso Project.

## II.    LEGAL STANDARD

While motions to compel arbitration are not responsive pleadings under Federal Rule

12(b), courts in the Ninth Circuit treat motions to compel arbitration "akin to a motion under Rule

12[.]"  *Lemberg v. LuLaRoe, LLC*, No. ED CV 17-02102, 2018 WL 6927836, at *3 (C.D. Cal.

Mar. 1, 2018) (collecting cases).  Weitz's motion is accordingly an appropriate response to Great

American's complaint.

"[A]n agreement to arbitrate is a matter of contract[.]"  *Chiron Corp. v. Ortho Diagnostic

Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  "The Federal Arbitration Act ('FAA') makes an

agreement to arbitrate 'valid, irrevocable, and enforceable,'" except "upon such grounds as exist at

law or in equity for the revocation of any contract[.]"  *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d

1052, 1057 (9th Cir. 2013) (quoting 9 U.S.C. § 2); 9 U.S.C. § 2.  "The FAA 'mandates that district

courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration

agreement has been signed.'"  *Kilgore*, 718 F.3d at 1058 (quoting *Dean Witter Reynolds, Inc. v.

Byrd*, 470 U.S. 213, 218 (1985)).

The FAA applies to written provisions in any contracts "evidencing a transaction involving

commerce," where "commerce" is defined as "commerce among the several States or with foreign

nations[.]"  9 U.S.C. §§ 1, 2.  If the "transaction involving commerce" element is satisfied, courts

must compel arbitration when 1) a valid agreement to arbitrate exists and 2) when "the agreement

encompasses the dispute at issue."  *Chiron*, 207 F.3d at 1130 (citing 9 U.S.C. § 4).  "If the

response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration

agreement in accordance with its terms."  *Id.*  "[A]ny doubts concerning the scope of arbitrable

issues should be resolved in favor of arbitration, whether the problem at hand is the construction

United States District Court
Northern District of California

of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."
*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). "A court may invalidate an arbitration agreement based on generally applicable contract defenses like fraud or unconscionability[.]" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) (quotations omitted).

The Subcontract, which contains the arbitration provision, is a contract between CES, a California company, and Weitz, an Iowa company, for HVAC installation at a construction project in California. Compl. ¶¶ 2, 10. The Subcontract is thus a "[c]ontract evidencing a transaction involving commerce" under the FAA. *See* 9 U.S.C. § 2; ECF No. 11 at 13. Great American does not argue otherwise. The Court then must determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130.

### III.    ANALYSIS

#### A.    There is a Valid Agreement to Arbitrate

##### 1.    Legal Standard

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). As the Court has diversity jurisdiction over this case, it applies California contract law. Under California law, "the elements for a viable contract are (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration." *Lara v. Onsite Health, Inc.*, 896 F. Supp. 2d 831, 838 (N.D. Cal. 2012) (citing *United States ex rel. Oliver v. Parsons Co.*, 196 F.3d 457, 462 (9th Cir. 1999)). At issue here is if Great American consented to be bound to the arbitration provision in the Subcontract when it incorporated the Subcontract into the Enso Performance Bond.

"Generally, the contractual right to compel arbitration 'may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration.'" *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (citing *Britton v. Co-op Banking Grp.*, 4 F. 3d 742, 744 (9th Cir. 1993)). "Nonetheless, courts have held that

*United States District Court*
*Northern District of California*

where a surety bond incorporates an underlying contract that contains an arbitration provision, the surety agrees to be bound by the arbitration provision of the underlying contract even if it was not a party to that contract." *Swinerton Builders, Inc. v. Argonaut Ins. Co.*, No. 23-cv-04158, 2024 WL 1057473, at *3 (N.D. Cal. Mar. 11, 2024) (citing *Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co.*, 6 Cal. 4th 1266, 1274 (1992)). *Boys Club* explained: "A contract performance bond will be read with the contract because…when a party enters into a contract to do certain work on certain terms, and procures a surety to guarantee the faithful performance of the work, the surety necessarily contracts with reference to the contract as made; otherwise it would not know what obligation it was assuming." 6 Cal. App. 4th at 1271 (quotations omitted). "And this is particularly so where the bond expressly declares that the contract is made a part of the bond and the terms of the contract are incorporated into the bond…" *Id.* at 1271-72. Under California law, "a performance bond and the underlying contract must be read together, as parts of substantially one transaction." *First Nat'l Ins. Co. v. Cam Painting, Inc.*, 173 Cal. App. 4th 1355, 1367 (2009) (quotations omitted); *Pac. Emps. Ins. Co. v. City of Berkeley*, 158 Cal. App. 3d 145, 151 (1984).

### 2.    Analysis

Here, the performance bond incorporates "by reference" the Subcontract and the arbitration provision contained within. Compl. at 148. In light of *Boys Club*, the Court finds that Great American "intended, and agreed, to be bound by the arbitration provision in the [Subcontract] even though it was not a party to the [Subcontract]" because the performance bond incorporated the Subcontract. 6 Cal. App. 4th at 1273. *Boys Club* favorably quotes *USF & G West Point Construction Co., Inc.*, 837 F.2d 1507, 1508 (11th Cir. 1988), which found that a surety had consented to an arbitration provision in a subcontract incorporated by reference in the performance bond:

> The subcontract was referred to and made a part of the bond. Disputes arising under the contract, including disputes concerning the adequacy of Pruett's [subcontractor] performance, were subject to arbitration pursuant to the arbitration provisions of the subcontract. We conclude that the incorporation of the subcontract into the bond expresses an intention of the parties, including USF & G [surety], to arbitrate disputes. Our conclusion is supported by the strong policy

favoring arbitration expressed by Congress in the Federal Arbitration Act[.]

Following *Boys Club*, the Court concludes that by incorporating the Subcontract and its arbitration provision into the performance bond, Great American intended to be bound by the arbitration provision. *See Allied World Ins. Co. v. New Paradigm Prop. Mgmt., LLC,* No. 16-cv-02992, 2017 WL 4310673, at *3 (E.D. Cal. Sept. 28, 2017) ("[A] abundance of case law provides that a surety may be bound by an arbitration clause in the underlying contract to which it is not a party where that contract is incorporated by reference in the Bond.").

Great American's argument that the performance bond's provision that "Any dispute pursuant to this Bond shall be instituted in any court of competent jurisdiction" precludes Great American's consent to the arbitration provision is unavailing. ECF No. 20 at 13; Compl. at 149. Although the performance bond contains a dispute resolution provision, it also incorporates the Subcontract. And the Subcontract establishes that the arbitration agreement in Exhibit D takes "priority" over the performance bond. Compl. at 88, 149. To the extent there is a conflict between the dispute resolution provision of the performance bond and the arbitration provision of the Subcontract, the terms of the Subcontract take precedence. *Id.* at 88

### B.    The Arbitration Agreement Encompasses Great American's Claims

The closer issue is if the arbitration provision in the Subcontract covers Great American's claims against Weitz. Even though the performance bond and Subcontract are "read together, as parts…of substantially one transaction[,]" "reading the two documents together does not automatically impose all obligations in the contract on" Great American. *Cam Painting*, 173 Cal. App. 4th at 1367 (quotations omitted); *Allied World*, 2017 WL 4310673, at *3. At the same time, [t]he scope of an arbitration clause must be interpreted liberally and 'as a matter of federal law, any doubts concerning the scope of arbitrable disputes should be resolved in favor of arbitration.'" *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (quoting *Moses H. Cone*, 450 U.S. at 24).

Weitz argues that the arbitration agreement's scope is broad, covering any "dispute, controversy or claim" regardless of who the dispute is between, and thus encompasses Great American's claims against Weitz. ECF No. 11 at 17. Great American contends that the

11

United States District Court
Northern District of California

1   arbitration provision only "provides for arbitration of disputes between Weitz and CES arising out

2   of the subcontract" and thus does not cover its claims against Weitz, which, it contends, arise

3   "from the terms of the [performance] bond itself – which has its own conflict resolution provision

4   providing for a court action" and the Enso Agreement.  ECF No. 20 at 7.

5          The Subcontract's dispute resolution provision at section 9.1 establishes that:

6                  In the event of any dispute, controversy or claim ("Claim") between
                   the Contractor and Subcontractor arising out of or related to the
7                  Subcontract Documents or the breach thereof, each party shall
                   promptly notify the other upon discovery of any Claim, and shall in
8                  good faith meet to resolve the Claim by mutual agreement…

9   Compl. at 100.  The subsequent section provides, "Any Claim not resolved under item 9.1 shall, at

10  the option of the Contractor, be determined by arbitration in accordance with the Federal

11  Arbitration Act…"  *Id.*  Weitz argues that section 9.1 defines the word "Claim" broadly as "any

12  dispute, controversy or claim" rather than as any dispute "between the Contractor and

13  Subcontractor arising out of or related to the Subcontract Documents or breach thereof[.]"  ECF

14  No. 11 at 15.  In support of their argument, they cite to the "basic principle that a defined term or

15  phrase applies to that which immediately precedes it, not that which comes after."  *SPS Techs.,*

16  *LLC v. Briles Aerospace, Inc.,* No. CV 18-9536, 2021 WL 5785264, at *17 (C.D. Cal. Sept. 3,

17  2021).  That is, because section 9.1 reads "In the event of any dispute, controversy or claim

18  ('Claim') between the Contractor and Subcontractor…" instead of "In the event of any dispute,

19  controversy or claim between the Contractor and Subcontractor arising out of or related to the

20  Subcontract Documents or the breach thereof ('Claim')…" as used in the Subcontract, "Claim"

21  means any dispute between any parties regarding any topic.

22          This argument is not persuasive.  First, Weitz's reading of the Subcontract's definition of

23  "Claim" is impermissibly circular.  By defining the word "Claim" to mean merely a "dispute,

24  controversy or claim," the definition is redundant.  Defining "Claim" to mean "claim" and

25  synonyms of the word "claim" states nothing new.  As used in the Subcontract, the term "Claim"

26  must mean something more.  Second, a basic principle of California contract interpretation is that

27  "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably

28

12

practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Section 9.2 provides that "Any Claim not resolved under item 9.1 shall, at the option of the Contractor," be subject to arbitration. Compl. at 100. Section 9.1 discusses the process for resolving disputes "between the Contractor and Subcontractor arising out of or related to the Subcontract Documents or the breach thereof[.]" *Id.* Reading sections 9.1 and 9.2 together, the arbitration provision at section 9.2 applies to the types of disputes described in section 9.1; namely, disputes "between the Contractor and Subcontractor arising out of or related to the Subcontract Documents or the breach thereof[.]" *Id.*

But rejecting Weitz's broad reading of the scope of the arbitration agreement does not end the analysis. In *Boys Club* the arbitration agreement required parties to arbitrate "[a]ll claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof…" 6 Cal. App. 4th 1270. Despite the arbitration provision being limited to disputes between the "Contractor and the Owner[,]" akin to the Subcontract's arbitration provision applying to disputes "between the Contractor or Subcontractor[,]" the California Supreme Court nonetheless held that the surety was bound by the arbitration provision. *Id.*; Compl. at 100. *Boys Club*, however, is factually distinct from the situation here: there, the contractor and owner were in the process of arbitrating disputes regarding the contractor's performance and the surety was ordered to join that arbitration; here, CES and Weitz are not involved in arbitration. In *Allied World*, the Eastern District found that *Boys Club*'s holding was limited to situations where there was "pending arbitration between the contractor and the owner[,]" and, where there was no such "pending dispute[,]" declined to order the surety to arbitrate its claims. 2017 WL 4310673, at *4 (emphasis removed).

The Court respectfully differs from *Allied World* and finds that the reasoning of *Boys Club* is not limited to situations where the principal and obligee are in arbitration and a surety is compelled to join. The California Supreme Court in *Boys Club* discussed *Fidelity and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.*, 48 N.Y.2d 127, 421 (1979), where, as described by the California Supreme Court, the Court of Appeals of New York held:

[W]here a performance bond incorporated a subcontract containing

> an arbitration clause, the surety agreed that disputes arising under the subcontract between the general contractor and the subcontractor would be submitted to arbitration and that the surety would be bound by the determinations made in arbitration; however, the surety did not agree that separate and distinct controversies which might arise under the terms of its performance bond between the surety and the general contractor as obligee would be submitted to arbitration.

6 Cal. App. 4th at 1273.  *Boys Club* rejected the approach of *Parsons & Whittemore* and compelled the surety to arbitrate the "claim against the performance bond*." Id.* at 1272-73.  The Court declines to find that Great American "did not agree that separate and distinct controversies which might arise under the terms of its performance bond between the surety and the…obligee would be submitted to arbitration" as such a conclusion is inconsistent with *Boys Club's* rejection of *Parsons & Whittemore*.[5]  Instead, because Great American entered into a "performance bond [that] incorporated a subcontract containing an arbitration clause[,]" the Court finds that it agreed "that separate and distinct controversies which might arise under the terms of its performance bond between the surety and the general contractor as obligee would be submitted to arbitration." *Id.*  Furthermore, the performance bond in this case included a broad incorporation of the Subcontract's provisions.  The plain terms of performance bond do not qualify its incorporation of the Subcontract, such that the arbitration provision would only apply to the surety upon the contractor and subcontractor first initiating an arbitration.

Great American argues that this creates a surplusage issue: if it is obligated to arbitrate

---

[5] *Boys Club* favorably cites *Exchange Mutual Insurance Co. v. Haskell Co.* 742 F.2d 274, 274-75 (6th Cir. 1984).  There, the contractor, Haskell, entered into a subcontract with Rogersville, the subcontractor. The subcontract incorporated the prime contract between Haskell and the property owner, which included the provision that "All claims, disputes and other matters in question arising out of, or relating to this contract or the breach thereof….shall be decided in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association." *Id.* at 275.  Rogersville obtained a performance bond from Exchange Mutual that incorporated the terms of the subcontract, listing Rogersville as the principal, Haskell as the obligee, and Exchange Mutual as the surety.  Rogersville allegedly breached the subcontract and Haskell made a claim against the performance bond and initiated arbitration proceedings against the surety, Exchange Mutual.  *Id.*  Exchange Mutual moved to restrain arbitration.  The Sixth Circuit held that Exchange Mutual could be compelled to arbitrate "where, as here, the performance bond incorporates by reference the obligation to arbitrate." *Id.* at 276.  *Boys Club's* approval of *Exchange Mutual* illustrates its overall holding that an agreement to arbitrate that has been incorporated into a performance bond applies not just to claims between the principal and obligee, but disputes between the obligee and surety.

claims against Weitz, then the separate dispute resolution provision of the performance bond serves no purpose.  *See* ECF No. 20 at 14.  As noted above, "[t]he whole of a contract is to be taken together, so as to give effect to every part[.]"  Cal. Civ. Code § 1641.  But the dispute resolution provision of the performance bond still plays a role.  As Weitz argues, it can elect not to arbitrate claims; if so, the dispute resolution provision, which provides that disputes "shall be instituted in any court of competent jurisdiction in the location in which the [Enso] Project is located[,]" would control.  Compl. at 149; *see* ECF No. 11 at 16.

Having determined that, under *Boys Club*, the arbitration provision may apply to disputes between Great American and Weitz, even when Weitz and CES are not in arbitration, the Court must next assess if Great American's claims against Weitz arise "out of" or are "related to the Subcontract Documents or the breach thereof[.]"  Compl. at 100.  .  As the "Subcontract Documents" includes, inter alia, the Subcontract, its exhibits, and the performance bond, the Court notes that the scope of the arbitration agreement is broad.  Great American's first claim is that Weitz breached the performance bond by refusing to make the Subcontract Balance—the amount of money Weitz owed CES for work it completed before it defaulted—available to Great American to complete CES's subcontract work on the Enso Project.  Compl. ¶ 40.  Weitz contends that it owes CES nothing due to CES's default (*Id.* ¶ 20) whereas Great American contends that the subcontract balance is $1,234,556.65.  *Id.* ¶ 19.  Great American is both asking the Court to interpret a provision in the performance bond to evaluate if Weitz owes $1,234,556.65 for CES's work pursuant to the Subcontract, and to ultimately award Great American this amount.  This claim is "related to the Subcontract Documents or the breach thereof" and subject to the arbitration provision.  Compl. at 100.

Great American's second claim is for declaratory relief that, under the terms of the Enso Agreement and the performance bond, the maximum amount Great American must pay Weitz (the penal sum) is $7,358,386.51.  *Id.* ¶ 53.  Weitz claims that the penal sum is $8,078,092.93.  *Id.* ¶ 52.  First, to the extent that this claim arises out of a dispute over the terms of the performance bond (which, again, is part of the Subcontract Documents), the claim is covered by the arbitration agreement.  Second, the arbitration agreement also applies to the extent that this claim arises out of

a dispute regarding the Enso Agreement.  Although Great American frames this dispute as separate from CES's performance under the Subcontract, they are not so distinct.  The penal sum is equal to the Subcontract Sum.  Compl. at 89.  While the Subcontract Sum and thus the penal sum were initially set at $7,358,386.52, when the scope or cost of CES's work increased, the penal sum was automatically adjusted to match it.  Weitz contends that determining the penal sum necessarily depends on the scope of work covered by the Subcontract.  ECF No. 23 at 12.  The Court agrees, and finds that Great American's second claim against Weitz is covered by the arbitration provision.

Great American's third claim is for declaratory relief regarding the meaning of section 3.6 of Exhibit D to the Subcontract.  *Id.* ¶ 57.  Section 3.6 specifies that Weitz may deduct money CES owes Weitz for other projects from the payments Weitz would otherwise have to make to CES. *Id.* at 92.  In addition to CES's subcontract for the Enso Project, CES subcontracted with Weitz to complete work on another construction project, the Mill District Project.  Compl. ¶ 34.  CES obtained a performance from Great American, and then defaulted on its subcontract for the Mill District Project.  *Id.*  Per Great American, Weitz claims Great American owes it $3,589,389 for CES's default in Mill District Project, and Weitz seeks to make an affirmative claim for that amount under the Enso Performance Bond based on the provision in the Subcontract allowing Weitz to make deductions from any amount CES owed it.  *Id.* ¶ 58, at 92.  Great American seeks a declaration that Weitz cannot make an affirmative claim against the Enso Performance Bond for this amount, and can only deduct this amount from what it owes CES.  Great American is asking for interpretation of a provision of the Subcontract.  This claim arises "out of or [is] related to the Subcontract Documents" and is thus covered by the arbitration agreement.  Compl. at 100.

### C.    The Arbitration Provision is Not Unconscionable

Great American argues that, even if it consented to the arbitration provision and its claims are covered, the arbitration provision is unconscionable and thus unenforceable.  ECF No. 20 at 20.  "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability."  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013).  "Under California law, a contract must be both procedurally and substantively unconscionable to be

rendered invalid." *Id.* at 922. "California law utilizes a sliding scale to determine unconscionability—greater substantive unconscionability may compensate for lesser procedural unconscionability." *Id.* "The procedural element of unconscionability focuses on oppression or surprise due to unequal bargaining power." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (quotations omitted). The substantive element focuses on whether the terms of the agreement are "overly harsh, unduly oppressive, unreasonably favorable, or…shock the conscience." *Id.* (quotations omitted). "The party resisting arbitration bears the burden of proving unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Market Dev. (US), LLC*, 55 Cal. 4th 223, 247 (2012).

### 1.    Procedural Unconscionability

"[P]rocedural unconscionability requires oppression or surprise. Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Pinnacle*, 55 Cal. 4th at 247 (quotations omitted). "[A] contract is procedurally unconscionable under California law if it is [1] a standardized contract, [2] drafted by the party of superior bargaining strength, that [3] relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Chavarria*, 733 F.3d at 923; *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000) (explaining that a procedurally unconscionable contract of adhesion "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it") (citations omitted).

Great American argues that both the performance bond and the underlying Subcontract are procedurally unconscionable because of a "lack of negotiation and meaningful choice[.]" *Pinnacle*, 55 Cal. 4th at 247; ECF No. 20 at 24.. It contends that the arbitration provision is procedurally unconscionable because Weitz "refused to revise" the Subcontract except for minor revisions relating to the scope of CES's work and the bond agent believed the Performance Bond provided by Weitz could not be modified. ECF No. 20 at 24. "CES and the bond agent had no opportunity to negotiate or modify the terms" in the Subcontract or performance bond and, Great American argues, were forced to accept Weitz's terms. *Id.* Great American further argues that

1   Weitz, which is part of a "massive global corporate conglomerate," had superior bargaining power

2   over CES.  *Id.* at 16-18, 24.

3                    **a.      The Subcontract is Not Procedurally Unconscionable**

4        Great American argues that the Subcontract between CES and Weitz is procedurally

5   unconscionable because "Weitz refused to revise the terms in its" standard form subcontract

6   agreement, "except for revisions relating to the scope of CES' work at the Enso Project."  ECF

7   No. 20 at 24.  Jeanette Pierce, Chief Financial Officer of CES, attests that CES negotiated with

8   Weitz to make modifications to Weitz's form subcontract agreement, but that Wietz:

9           refused to make various revisions to" their form subcontract
            agreement "except for revisions relating to the scope of CES' work at
10          the Enso Project.      Therefore, CES limited their requested
            revisions…to the scope of CES' work at the Enso Project and
11          inclusions and exclusions to CES' scope of work.

12  ECF No. 20-2 ¶¶ 11, 12.  Pierce attests that "CES agreed to Weitz's demands concerning what

13  revisions would or would not be made…because Weitz was such a large general contractor and

14  CES was a small subcontractor that did not have the bargaining power to demand revisions to the

15  terms of the Subcontract[.]"  *Id.* ¶ 21.

16       Turning to the elements set forth in *Chavarria*, first, the Court finds that the Subcontract

17  was a standardized contract drafted by Weitz.  *See* 733 F.3d at 923 (holding that a contract is

18  procedurally unconscionable if it is standardized, drafted by the party with superior bargaining

19  power, and provides no opportunity for negotiation).  Second, although Weitz is certainly a much

20  larger company than CES, CES appears to be no stranger to the bidding project and negotiating

21  subcontracts.  *See* ECF No. 20-2 ¶¶ 3, 7 (attesting that CES had an average revenue of between

22  $15 and $20 million in 2021, had submitted bids on prior construction projects, and had

23  "experience" negotiating subcontracts for "prior construction projects"); *see Grand Prospect*

24  *Partners, L.P. v. Ross Dress for Less, Inc.,* 232 Cal. App. 4th 1332, 1352 (2015), *as modified on*

25  *denial of reh'g* (Feb. 9, 2015) (finding that the plaintiff's considerable business experience did not

26  support a finding of procedural unconscionability).  The Court accepts that Weitz had "superior

27  bargaining strength" relative to CES, but does not agree that the imbalance was so great as to

28  make the bargaining process unconscionable.  *Chavarria*, 733 F.3d at 923; *Grand Prospect* Cal.

United States District Court
Northern District of California

18

1    App. 4th at 1353 ("The fact that [defendant] had more bargaining power than [plaintiff] does not

2    mean that inequality in power resulted in no real negotiations and an absence of a meaningful

3    choice."). And third, CES had more than "the opportunity to adhere to the [Subcontract] or reject

4    it[.]" *Armendariz*, 24 Cal. 4th at 113. CES proposed changes to the Subcontract. Weitz accepted

5    some and rejected others. ECF No. 20-2 ¶ 17-21. That Weitz did not accept all of CES's

6    proposed changes is not a clear indication of unconscionability but a normal part of negotiating.

7    CES's decision to only propose changes to the scope of its work was based on Pierce's general

8    understanding that "large general contractors, such as Weitz…do not negotiate the general legal

9    provisions" rather than Weitz's actual refusal to negotiate these terms. ECF No. 20-2 ¶ 10.

10   Pierce's belief that Weitz "would have rejected any request to negotiate" other terms of the

11   Subcontract is insufficient to show unconscionability. *Streedharan v. Stanley Indus. & Auto.,*

12   *LLC*, No. 22-55999, 2023 WL 9067587, at *2 (9th Cir. Jan. 4, 2023) (memorandum opinion); *see*

13   *Olson v. World Fin. Grp. Ins. Agency, LLC,* No. 24-cv-00477, 2024 WL 3498243, at *7 (N.D. Cal.

14   July 19, 2024).

15           Moreover, there is no evidence suggesting that CES was pressured or manipulated into

16   agreeing to the Subcontract. *See Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1245 (2016)

17   (holding there was no "oppression or sharp practices" indicative of procedural unconscionability

18   where the plaintiff "was not lied to, placed under duress, or otherwise manipulated into signing the

19   arbitration agreement"). Weitz solicited bids, CES submitted a bid and was accepted, Weitz sent

20   CES a contract, and the parties negotiated the contract. Great American provides no evidence that

21   CES did not have sufficient time to review the Subcontract or did not understand its terms. *See*

22   *Tyler v. Tailored Shared Servs., LLC*, No. 24-cv-01374, 2024 WL 4894589, at *5 (E.D. Cal. Nov.

23   26, 2024) (finding procedural unconscionability where the plaintiff "did not have time to read and

24   understand the agreement"); *Grand Prospect*, 232 Cal. App. 4th at 1352-53 (finding that

25   defendant "not impos[ing] deadlines during the negotiations for the purpose of pressuring

26   [plaintiff] into making a quick, ill-considered decision" supported a finding of no procedural

27   unconscionability). The absence of evidence of "oppression or sharp practices" undercuts Great

28   American's claim of procedural unconscionability. *Baltazar*, 62 Cal. 4th at 1245.

United States District Court
Northern District of California

The Court accordingly concludes that the Subcontract was not procedurally unconscionable.

### b.    The Performance Bond is Not Procedurally Unconscionable

Great American contends that the performance bond was procedurally unconscionable because it could not be negotiated. Weitz prepared a form performance bond and presented it to a bonding agent, who issues bonds under authorization from Great American. ECF No. 20 at 8, 20. CES sent the bonding agent Weitz's form subcontract agreements and checklists for obtaining the performance bond. *Id.* at 8; *see* ECF No. 20-1 ¶ 4. The checklist included the question and response: "Are bond terms per attached bond form required by Weitz? ___ Yes If no, Bonds are unacceptable[.]" ECF No. 20-1 ¶ 7. Based on the language of the checklist, the bonding agent believed that the form bond provided by Weitz "could not be modified or it would not be accepted by Weitz." *Id.* ¶ 9. The bonding agent proceeded with Weitz's form bond, which he executed as an agent of Great American. *Id.* ¶¶ 10-11. Weitz argues that the bonding agent's subjective belief that he "could not negotiate an agreement is insufficient to show procedural unconscionability." ECF No. 23 at 14.

The party claiming unconscionability must show that they were "*prevented* from negotiating" and only had the option of accepting or rejecting the contract. *Streedharan*, 2023 WL 9067587, at *2; *see Chavarria*, 733 F.3d at 923. The "subjective perception that [one] did not have the opportunity to negotiate" is insufficient. *Streedharan*, 2023 WL 9067587, at *2. Great American presents no evidence that the bonding agent or anyone else acting on behalf of Great American "attempted to negotiate" the terms of the performance bond and that Weitz refused to entertain proposed changes. *Olson* 2024 WL 3498243, at *7. That the bonding agent assumed Weitz would not negotiate and accepted Weitz's form performance bond as-is "is not sufficient to meet" Great American's burden of showing procedural unconscionability. *Streedharan*, 2023 WL 9067587, at *2.

The Court accordingly finds that neither the Subcontract[6] nor the performance bond are

---

[6] The fact that the arbitration provision was incorporated by reference in the performance bond does not, by itself, show procedural unconscionability. *See Pombon*, 846 F.3d at 1262

United States District Court
Northern District of California

procedurally unconscionable.  As "a contract must be both procedurally and substantively unconscionable to be rendered invalid[,]" the Court concludes that neither the Subcontract nor the performance bond are invalid due to unconscionability.  *Chavarria*, 733 F.3d at 922.[7]

## IV.    CONCLUSION

For the foregoing reasons, Weitz's motion to compel arbitration is granted.  The case is stayed pending completion of arbitration.  *See* 9 U.S.C. § 3.  Great American and Weitz shall have thirty days from the date of this Order to mutually select an independent arbitrator.

**IT IS SO ORDERED.**

Dated: July 30, 2025

LISA J. CISNEROS
United States Magistrate Judge

---

("[I]ncorporation by reference, without more, does not affect the finding of procedural unconscionability.").
[7] And if the Court were to address substantive unconscionability, it notes that the fact that only Weitz can choose to arbitrate claims is not in and of itself unconscionable.  The California Supreme Court "has confirmed that a one-sided contract is not necessarily unconscionable, [and thus] something more than the absence of mutuality" is required to support a finding of unconscionability.  *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1015 (9th Cir. 2023) (quotations omitted).

United States District Court
Northern District of California